# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| HENDERSON ROAD RESTAURANT SYSTEMS, INC. DBA HYDE PARK GRILLE, *et al.*, | CASE NO. 1:20-cv-01239-DAP |
|  | JUDGE: DAN AARON POLSTER |
| Plaintiffs, |  |
|  | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF COVERAGE UNDER THE ZURICH POLICY** |
| v. |  |
| ZURICH AMERICAN INSURANCE COMPANY, |  |
| Defendant. |  |

Pursuant to Fed.R.Civ.P. 56 and Loc.R. 7.1, Plaintiffs  Henderson Road Restaurant Systems, Inc. dba Hyde Park Grille, Coventry Restaurant Systems, Inc., dba Hyde Park Chop House, Chagrin Restaurants LLC dba Hyde Park Prime Steak House, JR Park LLC dba Hyde Park Prime Steak House, HP CAP LLC dba Hyde Park Prime Steakhouse, NSHP, LLC dba Hyde Park Prime Steakhouse, HPD Restaurant Systems Inc. dba Hyde Park Prime Steakhouse, 457 High Street Development LLC, CAP Restaurant Development LLC, RJ Moreland Hills, LLC, and Northville Development, LLC (collectively, "Plaintiffs") respectfully move this Court for summary judgment on the issue of coverage under Commercial Insurance Policy No. CPO 6220911-06 (the "Policy") issued by Defendant Zurich American Insurance Company ("Zurich").

## I.      INTRODUCTION

Plaintiffs are all owners of high-end steakhouses and seafood restaurants located in Ohio, Michigan, Florida, Indiana, and Pennsylvania. In March 2020, in response to the COVID-19 pandemic, the Governors (and/or other appropriate state officials) of Ohio, Michigan, Florida, Indiana, and Pennsylvania all issued orders that, among other things, prohibited in-restaurant

dining and otherwise restricted access to Plaintiffs' restaurants. The Ohio Orders, Michigan Orders, Florida Orders, Indiana Orders, and Pennsylvania Orders (collectively, the "Orders") are more fully described in the Stipulation of Facts[1] and are attached thereto as Exhibits B–F. *See* Stipulation of Facts, Doc. # 12, PageID# 102–106.

In response to the Orders, Plaintiffs closed all of their restaurants in Ohio, Michigan, Florida, Indiana, and Pennsylvania. *Id.* at PageID# 106–107. Due to the closures of their restaurants, Plaintiffs suffered significant financial losses and were forced to lay off staff. Saccone Declaration, ¶ 2, attached hereto as Exhibit A.  Many of Plaintiffs' restaurants may never re-open due to ongoing seating/capacity restrictions, and those that have reopened continue to suffer great losses and reduced staffing. *Id.* at ¶ 3.

On March 24, 2020, Plaintiffs submitted a claim (the "Claim") to Zurich under the Policy for loss of business income caused by the Orders. Stipulation of Facts, Doc. # 12, PageID # 107. For years, Plaintiffs faithfully paid their premiums to Zurich in anticipation that they would have business income coverage in the event they were forced to close their restaurants due to some fortuitous event, such as a governmentally-forced prohibition on in-person dining that no one could have reasonably foreseen. *Id.* at PageID# 102. However, Zurich failed to live up to its end of the bargain. Within weeks, Zurich denied coverage under the Policy. *Id.* at PageID# 108.

Because the plain language of the Policy provides coverage to Plaintiffs for their financial losses caused by closure of their restaurants in response to the Orders, the Court should **GRANT** Plaintiffs' Motion for Summary Judgment and hold that Plaintiffs are entitled to coverage under the Policy.

---

[1] Plaintiffs incorporate the Stipulation of Facts, Doc. #12, to this Motion for Summary Judgment as if fully rewritten herein.

II.     **STANDARD OF REVIEW**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the initial burden of showing that there is no material issue in dispute. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir.2015)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986)). A fact is deemed material only if it might affect the outcome of the case under the governing substantive law. *Id.* (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Id.* (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005)). Here, application of this standard calls for summary judgment being **GRANTED** in favor of Plaintiffs on the issue of coverage under the Policy.

III.    **LAW & ARGUMENT**

A.     **Under Ohio Law, Ambiguous Policy Language Is Interpreted In Favor Of The Insured.**

"A federal court sitting in diversity applies the substantive law of the state in which it sits." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citations omitted). Because this Court is located in Ohio, this Court must apply Ohio law to the Policy. Courts apply contract law when interpreting insurance policies. *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003); *City of Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St.3d 186, 187, 846 N.E.2d 843 (2006). Determining whether language contained in an insurance policy is ambiguous is a matter of law decided by the Court. *See Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir.1991).

When a term in an insurance policy is reasonably susceptible to more than one meaning, Ohio courts construe the term *in favor of the insured and against the insurer*. *Neal-Pettit v. Lahman*, 125 Ohio St. 3d 327, 2010-Ohio-1829, 928 N.E.2d 421, 424 (Ohio 2010); *Faruque v. Provident Life & Accidental Ins. Co.*, 31 Ohio St.3d 34, 508 N.E.2d 949 (1987), syllabus ("Language in a contract of insurance reasonably susceptible of more than one meaning will be construed liberally in favor of the insured and against the insurer"); *GenCorp Inc. v. Am. Intern. Underwriters*, 178 F.3d 804, 818 (6th Cir.1999) (holding that ambiguous language in an insurance policy must be *strictly construed against the insurer*). Specifically,  "in order to defeat coverage, 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.'" *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 2001-Ohio-1607, 757 N.E.2d 329, 332 (Ohio 2001)(emphasis added)(citations omitted). If the Court finds that a contract term is susceptible to two possible meanings, it does not matter whether the insured's "interpretation of the contract is the best one so long as it is reasonable." *Scott Fetzer Co. v. Zurich Am. Ins. Co.*, 769 F.App'x. 322, 326 (6th Cir.2019).

As to exclusionary language in insurance policies, such language must be clear and specific and a general presumption exists that that which is not clearly excluded from operation of the contract is included in the operation thereof. *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 214, 519 N.E.2d 1380 (1988).

**B.**     **Plaintiffs Are Entitled To Business Income Coverage Under The Plain Language Of The Policy.**

Application of the Policy's plain language to the facts presented here demonstrates that Plaintiffs are entitled to Business Income Coverage under the Policy as a matter of law. The Policy provides for Business Income Coverage, in pertinent part, as follows:

We will pay for the actual loss of **"business income"** you sustain due to the necessary **"suspension"** of your **"operations"** during the **"period of restoration"**. The **"suspension"** must be caused by direct physical loss of or damage to property at a **"premises"** at which a Limit of Insurance is shown on the Declarations for Business Income. The loss or damage must be directly caused by a **"covered cause of loss"**.

Stipulation of Facts, Exhibit A, Doc. 12-1, PageID # 276 (Emphasis sic).

Thus, to be entitled to coverage, Plaintiffs must show that (1) they necessarily suspended their operations, (2) they suffered a loss of business income due to the suspension of their operations, (3) the suspension was caused by direct physical loss of or damage to property at a premises, and (4) the loss or damage was directly caused by a covered cause of loss. Because the ***undisputed*** facts of this case satisfy all four of these elements, Plaintiffs are entitled to Business Income Coverage under the Policy as a matter of law.

### 1.      There is no dispute that Plaintiffs necessarily suspended their operations.

It is undisputed that there was a "suspension" of Plaintiffs' "operations." The Policy defines "suspension", in pertinent part, as "[t]he slowdown or cessation of your business activities." Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 209. The Policy defines "operations," in pertinent part, as "[y]our business activities occurring at the covered location prior to the physical loss or damage; and . . . [t]he covered location is tenantable prior to the physical loss or damage." *Id.* at PageID# 201. The parties have stipulated that (a) Plaintiffs closed six (6) Insured Premises in Ohio effective March 15, 2020 in response to the Ohio Orders; (b) Plaintiffs closed four (4) Insured Premises in Ohio effective March 15, 2020 for in-restaurant dining in response to the Ohio Orders, which were then completely closed by Plaintiffs effective March 18, 2020 in response to the Ohio Orders; (c) Plaintiffs closed one (1) Insured Premises in Indiana effective March 16, 2020 in response to the Indiana Order; (d) Plaintiffs closed two (2) Insured

5

Premises in Michigan effective March 16, 2020 in response to the Michigan Orders; (e) Plaintiffs closed one (1) Insured Premises in Pennsylvania effective March 17, 2020 in response to the Pennsylvania Orders; and (f) Plaintiffs closed two (2) Insured Premises in Florida effective March 20, 2020 in response to the Florida Orders.

Quite obviously, Plaintiffs' unfortunate closure of their restaurants constitutes a "cessation of [their] business activities." The restaurants were closed and not doing any business at all. Likewise, Plaintiffs' "business activities" at the Insured Premises prior to the issuance of the Orders constituted operation of dine-in restaurants. Saccone Dec., ¶ 4. Accordingly, when Plaintiffs closed their restaurants in March 2020 in response to the Orders, there was a "suspension" of their "operations" as defined by the plain language of Policy as a matter of law.

Moreover, Plaintiffs' suspension of their operations was "necessary". While the term "necessary" is not defined by the Policy, Webster's Unabridged Dictionary[2] ("Webster's") defines it as "required," "determined or produced by the previous condition of things," "logically unavoidable," and "compulsory." https://www.merriam-webster.com/dictionary/necessary. Here, the Orders prohibited in-person dining, among other things. In-person dining *is* Plaintiffs' business — which they were unable to operate. Accordingly, Plaintiffs closed their restaurants as required by the Orders and as the unavoidable result of the same.

> **2.    There is no dispute that Plaintiffs suffered a loss of business income due to the suspension of their operations.**

---

[2] The Policy provides that "words or phrases that are not defined are intended to have their ordinary and common meaning. Disputes concerning the meaning of words or phrases will be resolved using the most recently published version of Webster's Unabridged Dictionary." Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 182.

It is also be undisputed that Plaintiffs suffered a loss of "business income" due to the suspension of their operations. Specifically, the Policy defines "business income" as "'Net income; plus . . . 'Continuing expenses.'" Stipulation of Facts, Doc. # 12-1, PageID# 192. Under the Policy, "Net income" means "the net profit or loss . . . that would have been earned or incurred before taxes." Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 200. "Continuing expenses" means "[y]our continuing normal operating expenses including, but not limited to: 1) Payroll [and] 2) Rental payments as tenants." *Id.* at PageID# 193.

Upon closure of their restaurants in March 2020, Plaintiffs suffered a complete loss of profits, as they were closed and not doing **any** business. Saccone Dec., ¶ 5. They also had continuing payroll and rental payment obligations while closed. *Id*. Accordingly, under the Policy's plain language, Plaintiffs suffered a loss of "business income" as a result of the necessary suspension of their operations.

### 3.    The suspension of Plaintiffs' operations was caused by direct physical loss of or damage to property at the Insured Premises.

The Policy does not define the words "physical," "loss," "damage," or property." In accordance with the Policy, we look to Webster's to define these terms.

Webster's defines "physical" as "of or relating to material things." https://www.merriam-webster.com/dictionary/physical. Webster's defines "loss" as follows: "detriment, disadvantage or deprivation from failure to keep, have or get; something that is lost . . . the state of being deprived of or being without something one has had." https://www.merriam-webster.com/dictionary/loss. Webster's defines "damage" as follows: "injury or harm that reduces value or usefulness." https://www.merriam-webster.com/dictionary/damage. Webster's defines "property" as including intangible property: "something owned or possessed," "***the exclusive right to possess, enjoy, and***

*dispose of a thing : OWNERSHIP*," and "something to which a person or business has a legal title." https://www.merriam-webster.com/dictionary/property (Emphasis added).

    a.    **The forced closure of the restaurants in response to the Orders constitutes "physical loss of or damage to property" under the plain language of the Policy.**

Simply reading the relevant Policy language and applying the facts of this case demonstrates that the Orders constitute "physical loss of or damage to property" under the Policy. Plaintiffs' losses to property were both tangible and intangible.[3] Here, it is undisputed that each Plaintiff is party to a lease for the Insured Premises at which they operate their restaurants — and which generally ***require*** Plaintiffs to operate as fine dining restaurants. Saccone Dec., ¶ 6. As a result of the Orders, Plaintiffs suffered a "physical loss of . . . property," as the Orders "deprived" Plaintiffs of their ability to use the Insured Premises for in-person dining as provided for by their leases. Because they could not operate the Insured Premises as restaurants with in-person dining as they did prior to the issuance of the Orders — patrons were prevented from physically dining in the restaurants — Plaintiffs were "without something they once had." Plaintiffs "lost" their property (i.e., leasehold rights), including, without limitation, the right under the leases to "enjoy" operating the Insured Premises as restaurants with in-person dining.

Alternatively (the Policy requires ***either*** a physical loss of ***or*** damage to property), Plaintiffs suffered "damage to property" applying the plain, dictionary definition of those terms. For example, by preventing in-person dining, among other things, the Orders caused Plaintiffs "injury or harm that reduced value or usefulness" of their property — i.e., their "exclusive rights to possess, enjoy, and dispose of" the Insured Premises in the manner they saw fit (the operation

---

[3] Zurich will likely argue that damage to tangible property is required — but the Policy does not limit the definition of "property" to only tangible property.

of restaurants with in-person dining). Likewise, the Orders caused "injury or harm that reduced value or usefulness" of Plaintiffs' "legal title" to the Insured Premises, as the Orders placed new restrictions on the legal rights Plaintiffs previously had with respect to the Insured Premises pursuant to their leases. Accordingly, based on a plain reading of the Policy language alone, the Orders constitute "physical loss of or damage to property" under the Policy.

> **b.** **Recent federal judicial opinions involving forced closures of businesses in response to governmental closure orders indicate that such orders constitute "physical loss of or damage to property."**

To Plaintiffs' knowledge, this is the first COVID-related business interruption case in the country that is being determined at the summary judgment stage by a federal court, with a full evidentiary record. Plaintiffs grant that some courts that have ruled on business interruption claims premised on governmental closure orders have found against coverage. However, as discussed below, many of those cases are distinguishable for multiple reasons including, without limitation, the policy language at issue being much more limiting than that of the Zurich Policy. *See, e.g., Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 U.S. Dist. LEXIS 147276 (W.D. Tex. Aug. 13, 2020)(policy covered only "accidental direct physical loss to" covered property); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 U.S. Dist. LEXIS 171979 (N.D. Ill. Sept. 21, 2020)(policy covered only "direct physical 'loss' to property"); *Turek Enters. v. State Farm Mut. Auto Ins. Co.*, No. 20-11655, 2020 U.S. Dist. LEXIS 161198 (E.D. Mich. Sept. 3, 2020)(policy covered only "accidental direct physical loss to property"). This case presents novel issues due to its procedural posture and much more expansive policy language.

Notably, in analogous litigation involving business interruption insurance claims due to governmental closure orders that also involves similar policy language ("accidental physical loss

or accidental physical damage" to property), the United States District Court for the Western District of Missouri held that the relevant governmental closure orders caused a "physical loss" because "the Closure Orders prohibited or significantly restricted access to Plaintiffs' premises." *Studio 417 v. Cincinnati Ins. Co.*, W.D. Mo. No. 20-cv-03127, 2020 U.S. Dist. LEXIS 147600, *18 (Aug. 12, 2020). In reaching its decision, the *Studio 417* court explained that the policies at issue provide coverage for "'accidental physical loss *or* accidental physical damage.'" *Id.* at *13 (emphasis sic). The court further explained that "Defendant conflates 'loss' and 'damage' in support of its argument that the Policies require a tangible, physical alteration. However, the Court must give meaning to both terms. *See Nautilus Grp., Inc. v. Allianz Global Risks US*, No. C11-5281BHS, 2012 WL 760940, at * 7 (W.D. Wash. Mar. 8, 2012) (stating that 'if "physical loss" was interpreted to mean "damage," then one or the other would be superfluous')." *Id.  See also Sandy Point Dental*, 2020 U.S. Dist. LEXIS 171979 at *7, fn. 2 (explaining that the *Studio 417* court "rested its decision on that policy's expansive language, language very different from the policy in the instant case").

Likewise, within this Circuit, the United States District Court for the Eastern District of Michigan recently opined in *Turek* on the importance of the "physical loss ***of or*** damage to" policy language present here, as opposed to other, more limiting, policy language. Specifically, the *Turek* court rejected the plaintiff's claim for business income coverage due to its closure in response to the Michigan Orders, construing the policy to require "tangible damage" to trigger coverage. 2020 U.S. Dist. LEXIS 161198 at *21. However, the relevant policy language in *Turek* provided coverage only for "accidental direct physical loss to Covered Property." *Id.* at *12. And as the *Turek* court explained, "[t]he term here is 'direct physical loss,' not 'direct physical loss ***or***

10

damage.' Consequently, reading 'direct physical loss' to require tangible damage does not risk redundantly interpreting 'loss' and 'damage.'" *Id.* at *15 (Emphasis sic).

Moreover, the *Turek* court went on to further explain:

> Plaintiff suggests that "physical loss to Covered Property" includes the inability to use Covered Property. This interpretation seems consistent with one definition of "loss" but ultimately renders the word "to" meaningless. "To" is used here as a preposition indicating contact between two nouns, "direct physical loss" and "Covered Property." Accordingly, the plain meaning of "direct physical loss to Covered Property" requires that there be a loss ***to*** Covered Property; and not just any loss, a ***direct physical loss***. Plaintiff's interpretation would be plausible if, instead, the term at issue were "accidental direct physical loss ***of*** Covered Property." *See Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834, 838 (8th Cir. 2006) ("[T]he policy's use of the word 'to' in the policy language 'direct physical loss ***to*** property' is significant. [The claimant's] argument might be stronger if the policy's language included the word 'of' rather than 'to,' as in 'direct physical loss ***of*** property' or even 'direct loss ***of*** property.'")(emphasis original).

*Id.* at *16–17 (emphasis sic)(internal citations omitted).

Accordingly, as explained in *Studio 417* and *Turek*, the "direct physical loss ***of or*** damage to property" Policy language at issue here cannot be construed to require "tangible damage" to the Insured Premises because to do so would improperly conflate "loss" with "damage," when either is sufficient to trigger coverage under the Policy. Numerous courts throughout the country have similarly held that "tangible damage" such as structural alteration is ***not*** required to trigger coverage under insurance policies containing "physical loss of ***or*** damage to" property language. *See, e.g., One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 U.S. Dist. LEXIS 56565 at *25 (N.D. Ill. April 22, 2015)("where a general all-risk commercial or homeowner's policy insures against both 'loss' and 'damage' to an existing structure, 'physical' damage may take the form of loss of use of otherwise undamaged property, which in turn suffices

as a covered loss"); *Prudential Prop. & Cas. Ins. Co. v. Lilliard-Roberts*, No. CV-01-1362-ST, 2002 U.S. Dist. LEXIS 20387 at \*26 (D.Or. June 18, 2002) ("the inability to inhabit a building [is] a 'direct, physical loss' covered by insurance"); *American Guar. & Liab. Ins. Co. v. Ingram Micro, Inc.*, No. CIV 99-185 TUC ACM, 2000 U.S. Dist. LEXIS 7299 at \*6 (D.Az. April 19, 2000)(holding that "'physical damage' is not restricted to the physical destruction of computer circuity but includes loss of access, loss of use, and loss of functionality)".[4]

Moreover, because the Policy provides coverage for "direct physical loss *of* . . . property" as opposed to "direct physical loss *to* property," the Insured Premises themselves do not need to have suffered a direct physical loss. Rather, all that is required to trigger coverage is that **Plaintiffs** incur a direct physical loss *of* property at the Insured Premises. *See Turek* at \*16–17 (explaining that plaintiff's claim that its inability to use the covered property due to the Michigan Orders

---

[4] Plaintiffs acknowledge a series of cases out of the California federal courts decided on substantially similar allegations to those raised here and with similar policy language that *agree* "physical alteration" is not required to show "physical loss of or damage to property," but nonetheless denied coverage because the plaintiff's loss of use of the covered premises was not a "permanent dispossession." *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, No. 20-cv-03213-JST, 2020 U.S. Dist. LEXIS 168385 (N.D. Cal. Sept. 14, 2020). *See also 10e v. Travelers Indem. Co.*, 2:20-cv-04418-SVW-AS, 2020 U.S. Dist. LEXIS 165252 (C.D. Cal. Sept. 2, 2020); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, No.: 20-CV-907-CAB-BLM, 2020 U.S. Dist. LEXIS 166808 (S.D. Cal. Sept. 11, 2020). This "permanent dispossession" requirement was not based on any language in the relevant policies, but was instead lifted from *Total Intermodal Servs. v. Travelers Prop. Cas. Co. of Am.*, 17-cv-04908, 2018 U.S. Dist. LEXIS 216917 at \*11 (C.D. Cal. July 11, 2018), a case where the court held the claimant was entitled to coverage for lost cargo because "direct physical loss of" property under the relevant insurance policy "includes the permanent dispossession of something." But in discussing permanent dispossession, the *Total Intermodal* court was simply applying the facts of the case before it, not setting a bright line rule. Moreover, *Total Intermodal* dealt with personal property coverage, not business interruption. Quite obviously, the Policy's Business Income provision does not require "permanent dispossession" of the covered premises for coverage to apply. The Policy specifically contemplates a "period of restoration" wherein the covered premises is "capable of resuming the level of 'operations' which existed prior to the loss or damage." Applying a "permanent dispossession" requirement would substantially limit the Policy's scope of coverage in direct contravention of its plain language. This Court should not impose such a judicially created requirement derived from a wholly different context, as it is completely divorced from the Policy's plain language.

constituted "physical loss to covered property" would have been plausible had the policy covered "physical loss *of* covered property" instead of "physical loss *to* covered property").

And that is exactly what happened here. As a result of the Orders, Plaintiffs have been deprived (i.e., a "loss") *of* their rights of enjoyment of the Insured Premises (i.e., "property") because they were prohibited from using the Insured Premises for their intended purpose — dine-in restaurants. The fact another federal court found that governmental shutdown orders constituting "physical loss of property" is a "plausible" interpretation of that language means that the Policy language is, at a minimum, ambiguous. And, of course, under Ohio law ambiguous policy language *must* be construed liberally in favor of coverage. Accordingly, the only proper interpretation of the Policy in these circumstances is that the suspension of Plaintiffs' operations was caused by "direct physical loss of or damage to property" — Plaintiffs' loss of their ability to use the Insured Premises for their intended purpose due to the Orders.

> **4.** **The "period of restoration" began when the Orders were issued and ended/ends if/when their restrictions were/are lifted.**

The Policy provides that the "period of restoration" begins at the time the "direct physical loss or damage that causes "suspension' of your 'operations' occurs" and ends on the earlier of:

> a.   The date when the location where the loss or damage occurred could have been physically capable of resuming the level of "operations" which existed prior to the loss or damage, if the location had been restored to the physical size, construction, configuration, location, and material specifications which would satisfy the minimum requirements necessary to obtain all required building permits, occupancy permits, operating licenses, or similar documents; or

> b.   The date when a new permanent location is physically capable of resuming the level of "operations" which existed prior to the loss or damage, if you resume "operations" at a new permanent location.

Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 202.

A plain reading of this definition shows that the "period of restoration" began on the dates the Orders were issued, as they are the "direct physical loss or damage" that caused the "suspension" of Plaintiffs' "operations". Likewise, the "period of restoration" ended/will end on the dates the relevant restrictions in the Orders were/are lifted, as that constitutes the "date when the location where the loss or damage occurred could have been physically capable of resuming the level of 'operations' which existed prior to the loss or damage."

Notably, there is no requirement that structural repairs are a necessary precondition for a "period of restoration." In *Oregon Shakespeare Festival Ass'n. v. Great Am. Ins. Co.*, No. 1:15-cv-01932-CL, 2016 U.S. Dist. LEXIS 74450 at *16–17 (D.Or. June 7, 2016), for instance, the court rejected the insurer's argument that structural repairs were required in order to have a "period of restoration" such that there would be coverage under the policy. Instead, the court held that the "period of restoration" constituted the period of time it took for the wildfire smoke that had permeated the facility to dissipate. *Id.* The same holds true here. The Insured Premises are "restored" to their pre-Order status at the time the relevant restrictions in the Orders are lifted.

**5.     It is undisputed that the loss or damage was caused by a "covered cause of loss."**

Finally, the Policy requires that "[t]he loss or damage must be directly caused by a 'covered cause of loss'." The Policy defines "covered cause of loss", in pertinent part, as "a fortuitous cause or event, not otherwise excluded, which actually occurs during this policy period." Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 194. The Policy does not define "fortuitous," but Webster's defines it as "occurring by chance." https://www.merriam-webster.com/dictionary/fortuitous.

It is undisputed that the Orders were issued during "this policy period." Stipulation of Facts, Doc. # 12, PageID# 102–106. Moreover, it is beyond dispute that the Orders were

14

"fortuitous causes or events," as no serious argument can be made that anyone should have anticipated governmental orders being issued shutting down large swaths of the economy or that the Orders were issued due to anything other than by chance. As a result, the Orders plainly constitute a "covered cause of loss" so long as they are not otherwise excluded by the Policy. As explained more fully below in Section C, the Orders are not an excluded cause of loss under the Policy. Accordingly, the Court should **GRANT** summary judgment in favor of Plaintiffs on the issue of coverage under the Policy for their Claim.

C.     <u>No Policy Exclusions Apply.</u>

Plaintiffs anticipate that Zurich will argue that the Policy's so-called "Microorganism" exclusion should exclude coverage under the Policy. This argument fails, however, based both on the Policy's plain language and based on the insurance industry's misrepresentations to the Ohio Department of Insurance in 2006 when it requested approval to add the "Microorganism" exclusion to property liability policies.

**1.     The plain language of the "Microorganism" exclusion does not apply to the Orders.**

The Policy's "Microorganism" exclusion provides, in pertinent part, as follows:

> We will not pay for loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by the presence, growth, proliferation, spread, or any activity of **"microorganisms"**, unless resulting from fire or lighting.
>
> ***
>
> We will also not pay for loss, cost, or expense arising out of any request, demand, order, or statutory or regulatory requirement that requires any insured or others to test for, monitor, clean up, remove, treat, detoxify, or neutralize, or in any way respond to or assess the effect of **"microorganisms"**.

Stipulation of Facts, Exhibit A, Doc. # 12-1, PageID# 214 (Emphasis sic).

15

The Policy defines a "microorganism" as "any type or form of organism of microscopic or ultramicroscopic size including, but not limited to, **'fungus'**, wet or dry rot, virus, algae, or bacteria, or any by-product." *Id.* at PageID# 199 (Emphasis sic). Under Ohio law, exclusions are construed in favor of the insured; they do not exclude coverage unless they are clear and exact. *Moorman v. Prudential Ins. Co.*, 4 Ohio St.3d 20 (1983); *American Financial Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171 (1968). Application of this standard to the facts of this case demonstrates that the "Microorganism" exclusion does not bar Plaintiffs' Claim.

Plaintiffs' Claim has absolutely nothing to do with the "presence, growth, proliferation, spread, or any activity of 'microorganisms.'" In fact, the parties have stipulated that "[n]one of Plaintiffs' Insured Premises were closed as the result of the known or confirmed presence of SARS-CoV-2 or COVID-19 at any of the Insured Premises" and that "[t]here were no known or presumed infected person(s) with COVID-19 at any of the Insured Premises at any time from March 15, 2020 to April 27, 2020." Stipulation of Facts, Doc. # 12, PageID# 107. Rather, Plaintiffs' Claim was based solely on the forced closure of their restaurants in response to the Orders, which are most certainly not "microorganisms." Based on a plain reading, the "Microorganisms" exclusion, especially when construed in favor of the insured (as it must be), is inapplicable to the facts of this case.

Plaintiffs anticipate that Zurich will argue that the COVID-19 pandemic, not the Orders, is the real cause of Plaintiffs' losses and damage. But that argument is belied by what is actually happening today. The COVID-19 pandemic rages on, with Ohio, as well as the country as a whole, hitting record highs for new cases this past week. Nicole Acevedo, *Coronavirus cases break records as states in every part of U.S. reel under the surge*, NBC NEWS, October 24, 2020, https://www.nbcnews.com/news/us-news/coronavirus-cases-break-records-states-every-part-u-s-

reel-n1244647. However, despite the worsening pandemic, in-person dining has been allowed for months and continues to be permitted. Saccone Dec., ¶ 7. COVID-19 did not cause Plaintiffs' restaurants to close — the Orders did.  Further, at a minimum, the "microorganism" exclusion can be fairly and reasonably be interpreted as requiring the presence, activity, growth, etc. of the virus at the Insured Premises themselves, and there is no evidence before the Court that it is or has been.

> **2.       In any event, Zurich is estopped from arguing that the "Microorganism" exclusion applies.**

Beyond the fact that the plain language of the "Microorganism" exclusion does not apply to deny coverage here, Zurich is estopped from making this argument due to the representations made to the Ohio Department of Insurance in 2006 when the "Microorganism" exclusion was approved for inclusion in its property casualty insurance policies. Specifically, in 2006, the Insurance Services Office ("ISO"), on behalf of the insurance industry, requested approval from the Ohio Department of Insurance for inclusion of a new exclusion in property casualty policies for viruses, bacteria, and other disease causing agents. *See* Ohio Department of Insurance Records attached hereto as Exhibit B. In requesting approval of this new exclusion, the ISO explained the basis for its request as follows:

> The current pollution exclusion in property policies encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology). Although the pollution exclusion addresses contamination broadly, ***viral and bacterial contamination*** are specific types that appear to warrant particular attention at this point in time.
>
> An example of ***bacterial contamination*** of a product is the growth of listeria bacteria in milk. In this example, bacteria develop and multiply due in part to inherent qualities in the property itself. Some other examples of ***viral and bacterial contaminants*** are rotavirus, SARS, influenza (such as avian flu), legionella and anthrax. The universe of disease-causing organisms is always in evolution.

Disease-causing agents may render a product impure (change its quality or substance), or ***enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property***. When disease-causing ***viral or bacterial contamination*** occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

***Although building and personal property could arguably become contaminated*** (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. In addition, pollution exclusions are at times narrowly applied by certain courts. In recent years, ISO has filed exclusions to address specific ***exposures relating to contaminating or harmful substances***. Examples are the mold exclusion in property and liability policies and the liability exclusion addressing silica dust. Such exclusions enable elaboration of the specific exposure and thereby can reduce the likelihood of claim disputes and litigation.

While property policies have not been a source of recovery for losses involving ***contamination by disease-causing agents***, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.

***In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.***

Exhibit B (Emphasis added).

Based on the clear and repeated statements of the ISO, it represented to the Ohio Department of Insurance that the "Microorganism" exclusion was necessary to prevent against claims for ***property contamination*** from such agents. If this limited scope is not what was intended by the insurance industry, then the ISO misrepresented the scope of the exclusion to the Ohio Department of Insurance. Governmental closure orders unrelated to actual contamination of insured property are nowhere mentioned by the ISO in its representations to the Ohio Department

of Insurance regarding the scope of the requested exclusion. Because property losses and damage due to governmental closure orders were never indicated as potential excluded causes of loss by the ISO, Zurich is now estopped from arguing the "Microorganism" exclusion actually does exclude coverage for such undisclosed reasons.

The seminal case of *Morton Int'l v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993) is instructive here. In *Morton*, the New Jersey Supreme Court refused to enforce the standard pollution-exclusion in an insurance policy as written, finding that New Jersey regulatory authorities would have reasonably understood the clause to preclude coverage for the intentional discharge of known pollutants, not to eliminate all coverage for pollution-related claims except in cases of abrupt and accidental discharges, based on the representations the insurance industry made to regulators in requesting approval of the pollution exclusion. As the court explained:

> Although we have not heretofore applied the estoppel doctrine in a regulatory context, its application to these circumstances is appropriate and compelling. A basic role of the Commissioner of Insurance is to protect the interests of policy holders and to assure that insurance companies provide reasonable, equitable and fair treatment to the insuring public. In misrepresenting the effect of the pollution-exclusion clause to the Department of Insurance, the IRB misled the state's insurance regulatory authority in its review of the clause, and avoided disapproval of the proposed endorsement as well as a reduction in rates. As a matter of equity and fairness, the insurance industry should be bound by the representations of the IRB, its designated agent, in presenting the pollution-exclusion clause to state regulators.

*Id.* at 75–76 (internal citations and quotations omitted).

The same analysis applies with even more force here, as the plain language of the Policy is not otherwise clear that the "Microorganism" exclusion bars coverage for Plaintiffs' Claim based on the Orders and where the parties agree that there has been no known presence of or contamination from COVID-19 at any of the Insured Premises. Accordingly, the Court should find

19

that Zurich is estopped from arguing that the "Microorganism" exclusion bars coverage in this case based on the ISO's representations to the Ohio Department of Insurance while seeking approval of the "Microorganism" exclusion.

### 3.   The "Loss of Market or Delay" exclusion does not apply.

Plaintiffs anticipate that Zurich may attempt to argue that the Policy's "Loss of Market or Delay" exclusion excludes coverage for Plaintiffs' claimed losses. *See* Answer, Doc. # 5, PageID# 57 (asserting the same). The "Loss of Market or Delay" exclusion provides that:

> We will not pay for loss or damage caused by or resulting from loss of market, loss of use, or delay. This exclusion applies even if one of these excluded causes of loss was caused by or resulted from "mistake" or "malfunction."

Stipulation of Facts, Exhibit A, Doc. # 12-1 PageID# 214.

Quite obviously, applying this exclusion to bar Business Income coverage for "loss of use," when that is the entire purpose of Business Income coverage in the first place, is nonsensical. In *Oregon Shakespeare Festival*, the court rejected the same argument, explaining:

> The delay was and loss of use were caused by smoke. Thus it was caused by the claimed damage. In any other situation, if a delay or loss of use of covered property was caused by a claimed damage to the property, yet was excluded from coverage, that exclusion would void the entire purpose of the policy. This interpretation is unreasonable.

2016 U.S. Dist. LEXIS 74450 at *15.

The same analysis holds true here. Otherwise, the entire purpose of the Policy's Business Income coverage would be vitiated. This exception does not apply.

## IV.   CONCLUSION

Based on the foregoing, summary judgment should be **GRANTED** to Plaintiffs on the issue of coverage under the Policy.

Dated: October 30, 2020    Respectfully submitted,

          */s/ Mark R. Koberna*
          Mark R. Koberna (0038985)
          Rick D. Sonkin (0038117)
          Sean T. Koran (0085539)
          SONKIN & KOBERNA, LLC
          3401 Enterprise Parkway, Suite 400
          Cleveland, Ohio 44122
          Email:  mkoberna@sklawllc.com
              rsonkin@sklawllc.com
              skoran@sklawllc.com

          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

   I hereby certify that on October 30, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system:

          */s/ Mark R. Koberna*
          Mark R. Koberna (0038985)

          *One of the Attorneys for Plaintiffs*